986 F.2d 1431
 NOTICE: Although citation of unpublished opinions remains unfavored, unpublished opinions may now be cited if the opinion has persuasive value on a material issue, and a copy is attached to the citing document or, if cited in oral argument, copies are furnished to the Court and all parties. See General Order of November 29, 1993, suspending 10th Cir. Rule 36.3 until December 31, 1995, or further order.
 UNITED STATES of America, Plaintiff-Appellee,
v.
Harry Edward THOMAS, Defendant-Appellant,
 No. 91-4061.
 United States Court of Appeals, Tenth Circuit.
 Feb. 23, 1993.
 
 1
 Before EBEL, Circuit Judge, McWILLIAMS, Senior Circuit Judge, and EISELE*, Senior District Judge.
 
 
 2
 ORDER AND JUDGMENT**
 
 
 3
 G. THOMAS EISELE, Senior District Judge.
 
 
 4
 Back in 1984 and 1985 the Securities and Exchange Commission and the Internal Revenue Service conducted an investigation into the defendant's promotion and operation of a number of tax shelters. In connection with that investigation the United States applied for a search warrant before United States Magistrate Judge Ronald Boyce on January 11, 1985. The warrant was issued and executed on that same date. A great volume of papers and records along with some office equipment was seized from the offices of the defendant which offices were shared by a large number of corporations and partnerships.
 
 
 5
 On November 29, 1989, a grand jury sitting in the District of Utah, Central Division, returned an indictment against the defendant alleging in 16 counts various violations of 26 USC § 7206(2). A trial was held in the United States District Court from September 17, to September 28, 1990. On October 2, 1990, the jury found the defendant guilty on all 16 counts. The defendant was sentenced to three years imprisonment on Counts I, II, III, IV, and V, such sentences to be concurrent one with the other; two years on Count VI, consecutive to the sentences imposed under Counts I through V; a suspended sentence of two years on Counts VII through XVI with five years of probation to commence upon release from imprisonment. On March 29, 1991, the defendant filed his appeal in this Court challenging both the conviction and the sentence imposed. The appellant, Mr. Thomas, lists eight issues. He contends that:
 
 
 6
 1. The trial court erred in admitting evidence seized in violation of his Fourth Amendment rights.
 
 
 7
 2. The Grand Jury lacked subject matter jurisdiction and the trial court lacked venue over Counts 7, 8, 9, 10 and 13 under Article III of the Constitution and Federal Rule of Criminal Procedure No. 18.
 
 
 8
 3. He received ineffective assistance of counsel.
 
 
 9
 4. The charges in the indictment are multiplicitous.
 
 
 10
 5. The trial Court erred in refusing to grant him a continuance so that he could file a bill of particulars.
 
 
 11
 6. There was insufficient evidence to convict him.
 
 
 12
 7. The Court improperly instructed the jury that his intent was to be determined upon an objective rather than a subjective basis.
 
 
 13
 8. The Court incorrectly calculated the amount of damages for the purpose of sentencing.
 
 I. FOURTH AMENDMENT ISSUE
 
 14
 On January 11, 1985, Kenneth W. Crittenden, Special Agent with the IRS and Norman J. Korb of the Securities and Exchange Commission applied to Magistrate Judge Ronald Boyce for a search warrant in connection with their investigation of Mr. Thomas' promotion and operation of tax shelters. They presented to Judge Boyce certain affidavits for search warrant signed under oath by one or both of said officers. One of the affidavits states:
 
 
 15
 "That they have reason to believe that on the premises known as R.D.S., Inc., Suite 320, 5505 South, 900 East, Murray, Utah, a building located on the east side of 900 East and 5505 South being a three story light sand colored brick with the name 'Sports Mall Office Plaza', Suite 320. Suite 320 is located on the southwest corner of the third floor, in the Central Division District of Utah. There is now being concealed certain property namely:
 
 
 16
 1. Articles of incorporation, certificates of Limited Partnerships and all related records, minutes of shareholders' meetings, limited partnership meetings, directors and management meetings, and resolutions, directives, memoranda and other records thereto. These records are believed to be located in the file cabinet in Sandy Thomas' office, and in file cabinets in a file room located in the north end of the reception area in Suite 320. (hereinafter referred to as file room no. one).
 
 
 17
 2. Contracts, agreements and leases which related to business operations and services, and to the ownership of assets, including equipment and real property, together with fixtures and appurtenances thereto. These are believed to be located in a file cabinet in Sandy Thomas' office, and in file cabinets in file rooms number one, and in another file room which is located at the south end of the reception area in Suite 320.
 
 
 18
 3. Financial journals, and ledgers and records of the various entities, including but not limited to, general journals and ledgers, account ledgers, receipt and disbursement journals, financial statements and supporting records, adjusting journal entries, accounting work papers, analysis sheets, asset lists, equipment lists, budgets, charts, cashier's checks couchers, computer codes, computer runs, inventory records, insurance records, microfilm records, microfiche records, property appraisals, checking accounts statements together with deposit records, cancelled checks, debit and credit memoranda, duplicate deposit accounts and all related documents. Some of these records may be on computer printouts or storage disks and are believed to be in the file cabinets in Rolayne Nielsen's office and the file cabinets in Gary Houtz's office.
 
 
 19
 4. Brokers accounts and documents showing investments and transactions in securities, including statements, confirmations, memoranda, correspondence, and documents relating thereto. These are believed to be located in file rooms nos. one and two.
 
 
 20
 5. Stock and limited partnership records showing equity ownership including placement memoranda, stockholders' lists and ledgers, limited partnership subscription lists, cancelled stock certificates, stock transfer instructions, investment letters, correspondence, and all other documents relating thereto. These are believed to be in the file cabinets in Sandy Thomas' office and file room no. two and in large binders located on top of a wall storage unit in Rolayne Nielsen's office.
 
 
 21
 6. Written correspondence, memoranda, appointment books, cassette tapes and other records and documents relating to the business affairs of the enumerated corporations and limited partnerships as listed on the attached affidavits, which record dates, places and purposes of meetings, and the identity of persons with which business was negotiated or transacted. Various of these records believed to be in all of the individual office, including Thomas' office.
 
 
 22
 7. Bugging devices and telephone tape recording paraphernalia including all recordings from the same, which are believed to be in the conference room and in Thomas' office.
 
 
 23
 Which are fruits and instrumentalities of violations of § 17(a) of the Securities Act of 1933, 15 USC § 77Q(a), and § 10(b) of the Securities Exchange Act of 1934, 15 USC 78j(b), Rule 17 C.F.R. 240; and 26 USC § 7206(2).
 
 
 24
 8. The above items listed in paragraphs 1, 2, 3, 4, 5, and 6, only those which relate to the corporations and partnerships listed in the affidavits.
 
 
 25
 Apparently there was another affidavit, or other affidavits, which set forth the names of the various partnerships and corporations allegedly involved in the scheme together with a description of the phony paperwork, and maps and diagrams of Mr. Thomas's corporate offices indicating where relevant documents were kept. One of the affidavits listed some sixteen corporations and fifteen limited partnerships by name. All of this information was presented to Magistrate Judge Boyce.
 
 
 26
 Judge Boyce authorized the warrant, finding that there was probable cause to believe that the defendant was committing crimes and that evidence thereof would be found at the location specified in the warrant. At the direction of Judge Boyce the affidavits were specifically incorporated into the warrant by reference.
 
 
 27
 Ordinarily the affidavits would be attached to the warrant but the government moved to seal the Korb and Crittenden affidavits based on a finding that Mr. Thomas was a potential danger to the employees of Mr. Thomas (or of entities he controlled) who had cooperated with the government investigation. The Magistrate Judge granted the motion.
 
 
 28
 So the warrant as issued specifically incorporated the supporting affidavits by reference, but those affidavits were not attached to the warrant since they had been ordered sealed by the Magistrate.
 
 
 29
 The officers participating in the search were requested to read the affidavits before executing the warrant. And, during the execution of the warrant the agents were also given a list of the entities to which the warrant applied. Mr. Thomas was also given such a list at the time of the search. Furthermore, one of the affiants was present when the warrant was executed and available to answer any questions that any of the agents might have in regard to the search.
 
 
 30
 A very large volume of documents and papers were seized during the search. Not all of those papers and documents belonged to the corporations and limited partnerships itemized in Mr. Korb's affidavit. However, the government contends that such documents were "related to" those business entities.
 
 
 31
 The lower Court took evidence and heard arguments regarding the defendant's motion to suppress on July 5, 6, 9, and 10, 1990. The Court ruled that the search warrant, if taken together with the supporting affidavits, would be sufficient and lawful. However, it expressed concern that the affidavits were not physically attached to the warrant at the time it was executed. It therefore asked the parties to further brief the issues of the legal effect of the failure to physically attach the affidavits to the warrant.
 
 
 32
 The Fourth Amendment to the United States Constitution states:
 
 
 33
 The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.
 
 
 34
 The defendant argued that the warrant was a general warrant which must fail "due to its overbreadth and lack of particularity." As recognized by the lower court, the warrant would be general and therefore illegal if it were not supported by the information contained in the affidavits. Quoting US v. Leary, 846 F.2d 592, 602 (10th Cir.1988) the lower court observed that "practically speaking, the requirement that a warrant be particular means that the warrant must allow the executing officer to distinguish between items that may and may not be seized."
 
 
 35
 The search warrant itself commanded the agents to seize the property itemized in numbered Paragraphs 1-8 of the affidavits of Mr. Crittenden and Mr. Korb. See quoted above. The lower court observed that the language set out in those eight paragraphs does not sufficiently limit the scope in the search because the description of the items seized is no where limited to a particular entity or individual or to a specific transaction. By not limiting the search to a particular entity or transaction the above language encompassed virtually every document that one could expect to find at the place searched and did not "allow the executing officers to distinguish between items that may or may not be seized." To satisfy the Fourth Amendment "particularity" requirement it would be necessary to incorporate the detailed language in the affidavits into the warrant by reference.
 
 
 36
 The defendant argues that the affidavits were not incorporated by using "suitable words of reference" as required by Leary. However, the lower court found that the supporting affidavits were specifically incorporated by reference into the warrant thereby concluding that the language used by the magistrate judge constituted "suitable words of reference." We agree with the lower court's ruling on this point. This left defendant to argue that the failure to physically attach the affidavits destroyed the warrant's validity, leaving it general and overbroad.
 
 
 37
 The law in the Tenth Circuit presently requires the physical attachment of the affidavits and any other information needed to meet the particularity requirement of the Fourth Amendment. However, the Tenth Circuit rule was not established until after the search was conducted in this case on January 11, 1985. The government argued below, as it does here, that even if the court were to find that the warrant lacked particularity, the "good faith" exception granted in US v. Leon, 468 U.S. 897 (1984) should apply to this case and authorize the admission of the evidence seized in the search. The lower court discussed this issue as follows:
 
 
 38
 In Leon the Supreme Court modified the Fourth Amendment exclusionary rule by holding that the exclusionary rule should not bar the admission of evidence seized by officers acting in good faith and in objectively reasonable reliance on a warrant issued by a detached and neutral magistrate but later found to be invalid. Id. at 913; Leary, 846 F.2d at 607, citing United States v. Medlin, 798 F.2d 407, 409 (10th Cir.1986). Leon applied the good faith exception to a search warrant which lacked probable cause. In Massachusetts v. Sheppard, 468 U.S. 981 (1984), a case decided in conjunction with Leon, the Supreme Court extended the good faith exception to apply to a search warrant that lacked particularity. Id. at 988. The government argues that the officers reasonably believed that the affidavits were incorporated into the warrant and thus sufficiently limited its scope. The issue before the court is whether the circumstances in this case show that the officers acted in good faith and in objectively reasonable reliance on the warrant and their belief that the affidavits were incorporated therein even though the affidavits were not attached to the warrant.
 
 
 39
 The circumstances surrounding the (sic) both the application for and the execution of the warrant are relevant to the issue of the officer's good faith and reasonable reliance on the warrant. The agents applied for the warrant from a magistrate experienced in the field of criminal procedure. Magistrate Boyce is a well known law professor at the University of Utah, specializing in criminal law and procedure. When the agents presented the warrant to Magistrate Boyce he noted that it lacked particularity. Thus, before authorizing the warrant, Magistrate Boyce incorporated the supporting affidavits into the warrant to give the warrant sufficient particularity. To do this he used the words "incorporated by reference" on the face of the warrant. This evidences the magistrate's intent to incorporate the affidavits into the warrant and to limit the scope of the search through the affidavits.
 
 
 40
 A few hours prior to the execution of the warrant the participating agents read the affidavits and subsequently relied on that information to limit the search. During the search the agents were provided with a list of entities which were the subject of the search. The agents gave a copy of the list to the defendant at the time of the search. This entity list was part of the Korb affidavit and included the following corporations: Pen-Tec International, Inc., Magma Energy & Petrol Corp., Empire Redit Corp., Titan Corp., Terra Corp., RDS Inc., International Equities Inc., 1st National Credit Corp., National Fund, Inc., Petro Corp., Transworld Petroleum Oil services, Inc., 1st Western Corp., 1st Equities Corp. The list also included the following limited partnerships: Drillco Ltd., Drillco No. 2, Drillco No. 3, Drillco No. 4, Drillco No. 5, Energy Leasing Ltd., Energy Leasing No. 2, Energy Leasing No. 3, Leasco No. 6, Wyoming Leasing, XL Leasing Ltd., 1st Lease, MMM Leasing, Big Sky Leasing, and P.E.J. Leasing.
 
 
 41
 Defendant argues that because the affidavits were not physically attached to the warrant, the participating agents could not have reasonably relied on their belief that the affidavits were incorporated. The circumstances surrounding the failure to attach the affidavits, however, support the agents' claim of good faith. The affidavits were not physically attached to the warrant because they had previously been sealed by the magistrate. Magistrate Boyce sealed the affidavits after finding that the defendant was a potential danger to the employees who had cooperated in the government's investigation. Thus, a physical attachment of the affidavits would create a risk of harm. Moreover, the agents' reliance on the magistrate's decision to seal the affidavits, thus precluding attachment to the warrant, appears reasonable in light of the magistrate's finding that the defendant was a potential danger to his employees who cooperated with the government investigation.
 
 
 42
 Additionally, the Tenth Circuit's rule of physical attachment had not yet been decided when Magistrate Boyce issued the warrant in this case. As previously noted, the physical attachment rule was first mentioned by the Tenth Circuit in 1986 in United States v. Medlin, 798 F.2d 407, 410 n. 1 (10th Cir.1986). The rule was subsequently discussed in depth in United States v. Leary, 846 F.2d 592 (1988). It would be improper to find that the agents in this case acted in bad faith or unreasonably by not attaching the affidavits to the warrant when the physical attachment rule had not yet been established in the Tenth Circuit. Id. at 609 (noting that agents are not expected to "anticipate legal determination or resolve ambiguities in the law").
 
 
 43
 The Court agrees with Judge Anderson's analysis and his conclusion that, under the facts and circumstances found by him, the government was entitled to the good faith exception established by Leon.
 
 
 44
 With respect to documents seized that related to entities other than those noted on the entity list we agree with the analysis and disposition by the trial judge:
 
 
 45
 The fact that the officers seized documents relating to entities other than those included on the entity list does not mandate the conclusion that such a seizure was improper. Nor does it show that the officers lacked good faith in executing the warrant. Agent Kenneth Crittenden, who was present at the time the warrant was executed, testified, that, many items seized--while not expressly listing a named entity--were related to a named entity through prior transactions. "When a logical nexus exists between seized but unnamed items and those items listed in the warrant, the unnamed items are admissible." United States v. Gentry, 642 F.2d 385, 387 (10th Cir.1981) (and cases cited therein). If there is evidence offered that was seized outside the scope of the warrant with no logical nexus to the listed entities, its admissibility may be considered at trial. However, the exclusionary rule does not act to suppress evidence seized within the scope of a warrant simply because evidence outside the scope of the warrant was also unlawfully seized. United States v. Tamura, 694 F.2d 591, 597 (9th Cir.1982), citing United States v. Daniels, 549 F2d 665, 668 (9th Cir.1977).
 
 
 46
 II. CLAIM THAT THE TRIAL COURT LACKED SUBJECT MATTER JURISDICTION OVER CERTAIN COUNTS OF THE INDICTMENT.
 
 
 47
 Counts VII, VIII, IX, X and XIII of the indictment all involve violations of 26 U.S.C. § 7206(2), which provides that any person who
 
 
 48
 "(w)illfully aids or assist in, or procures, counsels, or advises the preparation or presentation under, or in connection with any matter arising under, the internal revenue laws, of a return, affidavit, claim, or other document, which is fraudulent or is false as to any material matter, whether or not such falsity or fraud is with the knowledge or consent of the person authorized or requires to present such return, affidavit, claim or document ..."
 
 
 49
 shall be guilty of a crime against the United States of America. Specifically, Mr. Thomas, (whose partnerships, in-house accountant and various other employees and entities were all based in a suite of offices located in Salt Lake City, Utah), was convicted of providing false and fraudulent K-1 forms to Wyoming investors. Those false forms were used by the Wyoming investors to prepare and file tax returns. The tax returns were thus prepared in Wyoming. The Wyoming investors at issue sent their tax returns to the Internal Revenue Service Center in Ogden, and the filing therefore took place in Utah.
 
 
 50
 Defendant challenges his convictions on these counts, claiming that all of the acts which comprise the alleged criminal activity in these counts took place in Wyoming, and, therefore, it is only in Wyoming that jurisdiction and venue for these charged offenses is appropriate. He is wrong. The crime may have been completed in Wyoming but on the venue issue that is not controlling. As stated by Judge Seth in U.S. v. Swego, 657 F.2d 243, 251 (1981):
 
 
 51
 18 U.S.C. § 3237(a) provides that any offense against the United States begun in one district and completed in another or committed in more than one district may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed.
 
 
 52
 [6, 7] The proper venue for the offense of making false statements to a federally insured bank may be either where the false statements were prepared, executed, or made, or where the offense was completed upon receipt of the false information by the bank.
 
 
 53
 Article III § 2 of the United States Constitution provides that the "trial of all crimes ... shall be held in the state where the said crimes shall have been committed." Reiterated in the Sixth Amendment, this requirement is further codified in Federal Rule of Criminal Procedure 18, which provides that criminal prosecutions "shall be had in a district in which the offense was committed." Fed.R.Crim.Pro. 18 (emphasis added). Rule 18 thus recognizes that in many instances, all aspects of an offense are not committed within a single district; the crime may expand beyond the borders of a single district. Congress has also recognized this phenomenon and addressed it in 18 U.S.C. § 3237(a), which provides:
 
 
 54
 (A)ny offense against the United States begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed. Any offense involving the use of the mails ... is a continuing offense and ... may be inquired of and prosecuted in any district from, through, or into which such ... mail ... moves.
 
 
 55
 Id. (emphasis added). Part (b) of this same statute provides that when the prosecution is for an offense in violation of certain Internal Revenue Code provisions, such as 26 U.S.C. § 7206(2), the defendant may elect to be tried in the district in which he resided at the time of the crime rather than in a district where venue is based solely on a mailing to the Internal Revenue Service in that district. Questions of venue "are not merely matters of formal legal procedure," but raise "deep issues of public policy." United States v. Johnson, 323 U.S. 273, 276 (1944). The underlying concern of venue provisions is to protect the accused "against the hardship and unfairness incident to a trial conducted in a remote place." United States v. Jackson, 482 F.2d 1167, 1178 (10th Cir.1973).
 
 
 56
 Section 7206(2) does not expressly identify where a violation is deemed to have occurred. In such a situation, "the locus delicti must be determined from the nature of the crime alleged, and the location of the act or acts constituting it." United States v. Anderson, 328 U.S. 699, 703 (1946). The location of the crime must be determined from the "key verbs" in the statute, which are "aids," assists in," "procures," "counsels," or "advises" the preparation or presentation of a false return. United States v. Griffin, 814 F.2d 806, 810 (1st Cir.1987).
 
 
 57
 Thomas argues that because the "communication" of sending the false K-1 forms to the investors was not complete until the forms were received in Wyoming. Thus, Thomas argues, the alleged crime did not occur until the forms were received in Wyoming, completing the "communication."
 
 
 58
 Thomas misses the point. The key verbs in the statute are mentioned above; "communicates" is neither listed, nor would it be dispositive. The defendant organized, established and directed tax shelters in Utah. Documents used by the investors to determine the extent of their deductions were prepared at the direction of the defendant in Utah. Defendant's offices were in Utah. The fraudulent tax returns, which relied in part upon defendant's documents, were filed in Utah.
 
 
 59
 Defendant is accused of providing the false documents and information which facilitated the preparation of false returns. All of the acts performed by him to accomplish this illegal task occurred in Utah. Defendant is not charged with making or presenting false returns in violation of 26 U.S.C. § 7206(1), but with aiding or assisting such presentation in violation of 26 U.S.C. § 7206(2). That aid or assistance was provided by defendant's acts in Utah, and defendant was properly indicted and tried in that district. See United States v. Bryan, 896 F.2d 68 (5th Cir.1990); United States v. Hirschfeld, 964 F.2d 318 (4th Cir.1992).
 
 
 60
 Furthermore, as noted above, Congress has already dealt with this issue in 18 U.S.C. 3237(a), the continuing offense statute. Under that statute, the locality of a crime for the purpose of venue extends "over the whole area through which force propelled by an offender operates." United States v. Johnson, 323 U.S. 273, 275 (1944). Here, Thomas sent forth the fraudulent information from Utah to Wyoming. Although the violation continued in another district, it was set in play in Utah. See United States v. Marchant, 774 F.2d 888, 891 (8th Cir.1985). As the Hirschfeld court stated:
 
 
 61
 [The defendant] reads § 7206(2) too narrowly in focusing only on where the return was prepared, mailed, and filed. The prohibition by its own terms reaches conduct which consists of aiding and assisting in the preparation of a false return. See United States v. Nealy, 729 F.2d 961, 962-63 (4th Cir.1984) (upholding conviction under § 7206(2) of a defendant who assisted in the preparation of a false engineering report which he knew would be used to compute unjustified deductions).
 
 
 62
 Hirschfeld, 964 F.2d at 321. This case concerns an offense which was begun in one district and completed in another; under such circumstances, venue may be proper in more than one district. See United States v. Blecker, 657 F.2d 629, 632 (4th Cir.1981). Without deciding whether venue could be proper in Wyoming, this Court finds that venue is clearly proper in Utah. The Court also notes that inquiring and trying the defendant in Utah in no way violated any of the underlying principles of our venue requirements. Thomas was indicted and tried on his home turf, which also happened to the be locus delicti of the crime for which he is accused. Venue was proper therein.
 
 III. INEFFECTIVE ASSISTANCE OF COUNSEL CLAIM
 
 63
 Under the Sixth Amendment a defendant in a criminal case is guaranteed the right to counsel which has been interpreted to mean the right to "effective assistance" of counsel. Strickland v. Washington, 466 U.S. 668, 686. Strickland established a two-prong test. First, the defendant must show that his or her attorney's performance was in fact defective. Second, the defendant must show that the defective representation prejudiced the defense to the point that:
 
 
 64
 ... there is a reasonable probability that, but for counsel's unprofessional errors, the result ... would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.
 
 
 65
 Id. 6914.
 
 
 66
 The defendant contends that his trial attorney's illness precluded a meaningful completion of the discovery process resulting in ineffective assistance of counsel.
 
 
 67
 Prior to the trial defendant's then counsel suffered from an illness which in time resulted in surgery. More particularly, during the week of May 27, 1990, he became ill and was unable to work full time. The surgery occurred on June 4, 1990. An infection followed which required additional surgery. Defendant claims that, as a result, his attorney's ability to function was impaired; that he was absent from his office until approximately June 18, 1990; and that his ability to function effectively remained impaired until June 22, 1990. As a consequence defendant contends 1) his trial attorney failed to provide certain exhibits as required, resulting in some of those exhibits being excluded from evidence; 2) his attorney failed to file a motion for a bill of particulars or a motion to dismiss; and 3) his attorney's illness precluded adequate preparation for trial including an investigation of the government's witness. Finally defendant argues that his attorney's illness, "coupled with the refusal of the court to grant a continuance" seriously damaged his defense.
 
 
 68
 The defendant, however, makes no particularized showing, 1) with respect to any exhibits that were excluded because of his counsel's failure to provide same in a timely manner or how their exclusion unfairly prejudiced him; 2) with respect to the information that should have been sought by any bill of particulars and how its unavailability prejudiced him; or 3) as to any particular witness or witnesses, defendant's counsel's illness prevented him from investigating or how the failure to do so prejudiced him.
 
 
 69
 It must be noted that the trial was held from September 17, 1990, until September 28, 1990. Defendant focuses on his attorney's intermittent illness from May 27, 1990, until June 22, 1990, during which his ability to work was "impaired." Furthermore, the record reflects that the court did, indeed, grant a continuance "since defendant's attorney has been ill and unable to effectively prepare for trial." (Order, App.A 153) As a consequence the trial was postponed from July 9, 1990, until September 17, 1990.
 
 
 70
 We have carefully reviewed the record and find no merit in defendant's ineffective assistance claim. He has failed to demonstrate that his counsel's performance was defective. Nor has he shown how he was prejudiced. As a consequence there is no basis for his claim that, but for his counsel's unprofessional errors, the result in his trial would probably have been different.
 
 IV. MULTIPLICIOUS CLAIM
 
 71
 The defendant contends that the jury was presented with a sixteen-count indictment whereas the indictment should have contained only six counts.
 
 
 72
 Under the first six counts Mr. Thomas is charged with assisting in the preparation of false and fraudulent tax returns for five limited partnerships and one sub-chapter S corporation in violation of 26 U.S.C. § 7206(2). In the remaining ten counts Mr. Thomas is charged with violations of the same statute by providing false and fraudulent K-1 forms to individual Wyoming investors so that those investors would use such false forms in the preparation of their individual tax returns.
 
 
 73
 The appellant contends that there was no evidence that he assisted the ten individual Wyoming investors "in any manner other than providing them copies of a portion of the return for which he was indicted in the first six counts." He therefore contends that the charges in counts 7-16 are multiplicious and that he is entitled to a new trial.
 
 
 74
 "An indictment is multiplicious if it charges a single offense in more than one count." U.S. v. Haddock, 956 F.2d 1534, 1546, cert. denied 113 S.Ct. 88 (1992) (10th Cir.1992).
 
 
 75
 The appellant is wrong in his contention that he is charged with the same criminal conduct in counts 7-16 as that charged in counts 1-6. The first six counts charge him with assisting in the preparation of the false returns on behalf of the five limited partnerships and Wyoming Leasing. The remaining counts charge him separately with willfully aiding in the preparation of ten false individual returns. He is therefore charged with aiding in the preparation and presentation of sixteen separate false tax returns. And the proof established more than that the defendant merely provided copies of the false information from the six limited partnerships and the sub-chapter S corporation returns to the ten individual investors. The proof also shows that the defendant, or persons working under his direction, convinced the individual Wyoming investors to invest their funds in these ventures, often by representing that said investors would receive extensive tax benefits.
 
 
 76
 It is clear that the defendant could have been convicted on the first six counts even if he had not provided the Wyoming investors with the false K-1 forms. It is also true that he could be found guilty of the violations alleged in counts 7-16 even if he had not actually caused the filing of the six false entity returns. See U.S. v. Isrealski, 597 F.2d 2, 24-25 (2nd Cir.1979) There convictions for separate corporate and personal tax evasion were up-held where "separate steps were necessary to complete each evasion and it was the intentional causing of false information to be filed in each entity's false tax return that was the criminal act in each instance."
 
 
 77
 This court, in dealing with such a challenge, discussed charges filed under 18 U.S.C. § 1001. It observed "we feel the statute aims at the making or using of such 'false writings or documents' and intends the wrong connected with each to be a separate offense." U.S. v. Bettenhausen, 499 F.2d 1223, 1234 (10th Cir.1974). The applicable "unit" of prosecution is the tax return. U.S. v. Esch, 832 F.2d at 541. Therefore each false tax return that the defendant willfully caused to be filed gave rise to a separate offense. The defendant multiplicious claim is without merit.
 
 
 78
 V. CLAIM OF ABUSE OF DISCRETION FOR REFUSAL TO GRANT CONTINUANCE
 
 
 79
 This Court held in U.S. v. Mitchell, 765 F.2d 130, 132 (10th Cir.1985):
 
 
 80
 The decision to grant or deny a motion for continuance is committed to the sound discretion of the trial judge. His decision will be reversed on appeal only upon a showing of clear abuse of discretion resulting in manifest injustice.
 
 
 81
 And, as stated in U.S. v. Rivera, 900 F.2d 1462, 1475 (10th Cir.1990):
 
 
 82
 A trial judge's decision to deny a motion for a continuance constitutes an abuse of discretion only if the denial was "arbitrary or unreasonable and materially prejudiced the [defendant]."
 
 
 83
 The appellant, in support of his contention that the trial court abused its discretion by failing to grant his motion for a continuance, states that his trial "counsel had been diligent in his trial preparation until such time as he became ill" and that "prior to that time defendant had conducted significant discovery and had filed a number of motions." Brief of Appellant, p. 30.
 
 
 84
 However, appellant has a problem. The trial court granted the continuance, moving the trial from July 9, 1990, to September 17, 1990, a postponement in excess of two months. When the government makes this point in its brief, appellant returns to his argument that the trial court erred in refusing to permit him to file a bill of particulars. We have already dealt with that contention. See under "Ineffective Assistance of Counsel Claim," supra.
 
 VI. CLAIM OF INSUFFICIENCY OF THE EVIDENCE
 
 85
 The narrow focus of appellant's contentions here is that there was insufficient evidence that he had the required criminal intent, one of the elements of each of the crimes for which he has been convicted.
 
 
 86
 Appellant argues his lack of education (only high school) and that he relied entirely upon the advice of tax professionals, both attorneys and accountants, to guide him in this "complex area of the tax law." He contends that he did not conceal any information from the accountants or tax attorneys who helped him set up the shelters.
 
 
 87
 On review of a claim of insufficient evidence the appellate court must determine whether a rational jury, viewing the evidence in the light most favorable to the government, could have found the defendant guilty beyond a reasonable doubt. United States v. Boure, 892 F.2d, 1494, 1497 (10th Cir.1990). After a careful review of the evidence the court concludes that a rational jury could find the defendant guilty beyond a reasonable doubt on the evidence presented.
 
 
 88
 It is not necessary to detail all of the evidence. In short, Thomas had a tax-shelter scheme in which he controlled one corporation and five limited partnerships. He would buy certain assets at fair market value from outside third parties and, through a series of paper transactions between the related companies, "resell" the assets at grossly inflated prices. The assets would then be carried on the limited partnership books at the inflated values, and investors would receive depreciation deductions and investment tax credits based on investments in the limited partnerships. Thomas' business entities prepared false Schedule K-1's that reflected the deductions and credits.
 
 
 89
 For example, Thomas bought a VCR and wide screen television for $5,130; by the time the units reached the final limited partnership, they were carried on the books at 307,800. He bought twenty horses for a total of $12,400; the horses were eventually carried on the books at $3 million.
 
 
 90
 The jury could have found the necessary willfulness and criminal intent on the basis of such evidence alone. The obviously sham nature of these transactions could lead to such an inference. But there was more evidence relating to defendant's intent.
 
 
 91
 Mr. Thomas did not sign the tax returns filed by the 5 partnerships and Wyoming Leasing. Instead he paid someone who personally had little information about his business to sign as the "general partner" of the partnerships and the appropriate officer of Wyoming Leasing. This raises an inference of guilty knowledge. More directly, the evidence of the defendant's instructions to his daughter on how to describe the resold equipment ("lengthy and flowery") and his instructions not to keep records showing the inflation of assets because "it would destroy him" support the jury's verdicts. And this evidence negates his position that he relied solely on the advice of professionals. Furthermore, the manner in which the defendant used professionals, and his attitude toward them, could further undermine his "reliance" defense. According to Mr. Preston, a salesman for some of Mr. Thomas' companies, Mr. Thomas stated:
 
 
 92
 "... you need to decide what you want to have happen and then supply the professional with the proper documentation and figures, statistics, in order to get back the predetermined idea what you wanted."
 
 
 93
 While there was much evidence from which a rational jury could have found for the appellant in the issue of willfulness, there was also ample evidence to support its finding of criminal intent.
 
 
 94
 VII. THE CLAIM THAT THE COURT IMPROPERLY INSTRUCTED THE JURY ON THE STANDARD FOR DETERMINING INTENT
 
 
 95
 Mr. Thomas argues that the instructions given by the trial court in this case to the jury, individually and in their overall effect, were given under an impermissible objective standard. He therefore urges that the jury's verdict should be vacated and the matter returned for a new trial.
 
 
 96
 Specifically, Mr. Thomas objects to Jury Instructions # 18[3], 27[4], 32[5], 38[6], 39[7], 42[8], 44[9], 45[10], and 49[11]. Mr. Thomas also objects to the Court's refusal to give certain instructions requested by defendant. Specifically, Mr. Thomas objects to the refusal to use the second paragraphs of defendant's proposed instructions # 3[12] and 9[13], as well as defendant's proposed instructions 20[14] and 21[15].
 
 
 97
 First, the Court notes the standard of review for jury instructions. Jury instructions are reviewed as a whole. United States v. Pinto, 838 F.2d 426, 435 (10th Cir.1988). That is, the overall impact must be examined, rather than merely focusing on the specific language of an individual instruction. Furthermore, "(t)he trial court is given substantial discretion in tailoring and formulating its instructions, so long as they correctly state the law and fairly and adequately cover the issues presented." Id. at 436 (citing United States v. Pack, 773 F.2d 261, 267 (10th Cir.1985). This Court concludes that the trial court did not abuse its discretion in formulating the jury instructions for this case.
 
 
 98
 Defendant bases his argument in large part on the case of Cheek v. United States, 111 S.Ct. 604 (1991). Cheek held that a good-misunderstanding of the law or a good-faith belief that one is not violating the law negates willfulness, whether or not the claimed belief or misunderstanding is objectively reasonable. Prior to Cheek, the Seventh Circuit had held that good-faith misunderstanding of the law negates willfulness only if the defendant's beliefs are objectively reasonable; in the Seventh Circuit, even actual ignorance was not a defense unless the defendant's ignorance was itself objectively reasonable. See, e.g., United States v. Buckner, 830 F.2d 102 (1987). The objected to instruction in Cheek provided in part that "an honest but reasonable belief is not a defense and does not negate willfulness." Cheek, 111 S.Ct. at 608.
 
 
 99
 This Circuit has long held that a subjective standard rather than an objective standard must be applied when assessing defendant's claimed belief that he was acting in good faith in a criminal tax prosecution. See, e.g., United States v. Phillips, 775 F.2d 262 (10th Cir.1985). The trial court's instructions in this case were consistent with the subjective standard requirement.
 
 
 100
 Instruction 18 (footnote 1, supra ) is correct as a matter of law and has been addressed by this Court before. This Court specifically approved the first paragraph of that instruction, while specifically recommending the second paragraph. United States v. Glick, 710 F.2d 639, 642-644 (10th Cir.1983), cert. denied, 465 U.S. 1005 (1984).
 
 
 101
 Instruction 27 (footnote 2, supra ), informed the jurors of the elements of the offense and explained that the Government had to prove each element beyond a reasonable doubt. There is no "objective" standard imposed on the defendant's state of mind in this instruction.
 
 
 102
 Instruction 32 (footnote 3, supra ) recognizes what this Court has long held regarding proof of intent: "The issue of criminal intent is a factual question seldom provable by direct evidence but may be inferred from all the facts and circumstances of the case which reasonable tend to show a mental attitude." United States v. Fleming, 479 F.2d 56, 57 (10th Cir.1973). The instruction at issue specifically focuses on the defendant's state of mind, a properly subjective standard.
 
 
 103
 Instructions 38 and 39 were requested by the defendant. Instruction 38 (footnote 4, supra ) describes the law, not the state of mind. It explains that the transaction must be "arms-length" to be acceptable for tax purposes; it does not state that a non-arms-length, and hence unacceptable for tax purposes, transaction would be sufficient to supply the requisite "willfulness" in this criminal matter. Instruction 39 (footnote 5, supra ) also merely describes the law and does not impose an objective state of mind standard.
 
 
 104
 Defendant objected to Instruction 42 (footnote 6, supra ) because he claimed that reliance of the advice of counsel was an absolute defense fully negating willfulness. Defendant misstates the law, which was correctly stated by the trial court's instruction. If a client goes to an attorney and provides the attorney with incomplete information, receives advice based upon that incomplete information, and then acts "in reliance" on advice of counsel, he has not necessarily acted in good faith, and willfulness may still be found by the jury. This is the point which the trial court attempted to clarify by adding the last sentence to a stock instruction. There was no need for clarification, and the repetitious focus on the defendant's duty was also unnecessary. The last sentence, taken alone, might leave a question as to the standard. And of course, had the trial court instructed the jury that it could consider the defendant's reliance on legal advice as a defense only if that reliance was reasonable, Cheek concerns would be implicated. That was not the case here. Furthermore, the remote possibility of jury confusion in light of this one added sentence is more than offset and compensated for by the instructions as a whole.
 
 
 105
 Mr. Thomas's objections to Instructions 44, 45, and 49 are also unfounded. Instruction 44 (footnote 7, supra ) specifically reminds the jury that "the government must prove specific criminal intent ...", and is clearly proper. Instruction 45 (footnote 8, supra ) and 49 (footnote 9, supra ) are also correct statements of law, with no impermissible inferences.
 
 
 106
 The defendant, of course, has no right to have his proposed instructions utilized by the Court. He has the right to have the jury properly and adequately instructed as to the law. If the jury is so instructed, the defendant has no cause to complain. In this case, the District Court repeatedly instructed the jury to determine the issue of willfulness based on defendant's state of mind, and to acquit unless the government proved beyond a reasonable doubt that Mr. Thomas had voluntarily and intentionally violated a known legal duty not to aid or assist others in the filing of false returns. The jury was told that "an act is done willfully if done voluntarily and intentionally and with the specific intent to do something the law forbids" and that an act is not willful if "the result of negligence, or reckless disregard for the requirements of the law, or due to a good faith misunderstanding of the requirements of the law." The jury was further advised that:
 
 
 107
 "Under our system of laws, individuals are not punished criminally for mere mistakes, mere mismanagement, mere carelessness, or mere errors of judgment. Nor are they punished for greed. They are punished only for intentional wrongdoing. The defendant is not on trial for errors of judgment, being greedy, making mistakes, or mismanagement. He is on trial for acting with a criminal intent, which is incumbent upon the government to prove to your satisfaction and beyond a reasonable doubt ..."
 
 
 108
 These are but some examples of the many times that the District Court emphasized the need for specific, subjective, criminal intent. Viewing these instructions as a whole, this Court concludes that the instructions properly and adequately instructed the jury, and that the District Court did not abuse its discretion in formulating the instructions used in this case.
 
 
 109
 VIII. CLAIM OF INCORRECT CALCULATION OF DAMAGES FOR SENTENCING PURPOSES
 
 
 110
 The appellant contends that the trial judge, for sentencing purposes, incorrectly calculated the amount of the loss suffered by the government and that therefore the sentences should be vacated. He asks for a new sentencing hearing at which the government would be required to produce the information necessary to determine the true loss.
 
 
 111
 This is a pre-guidelines case for sentencing purposes. Under that regime the District Courts enjoyed wide, and generally unreviewable discretion in determining the sentences to be imposed. See United States v. Bryant, 892 F.2d 1466, 1470 (10th Dir.1989), cert. denied 110 S.Ct. 3220 (1990).
 
 
 112
 Here the defendant contested a statement in the pre-sentence report as to the amount of the loss. The Court held a hearing, then issued a ruling. In that ruling the Court stated that its purpose was not to arrive at a "precise dollar figure" that the government was incapable of collecting because of defendant's crimes. The Court stated that its objective was to measure "the depth and breadth of defendant's fraudulent scheme" and to gain a "shorthand indication" of the "general" damages suffered by the government. The Court found that the scheme resulted in $1.37 million in overstated investment tax credits. And the Court accepted revenue agent's analysis that the losses from fraudulent depreciation claims exceeded $649,291. Thus the total tax loss was more than $2,000,000. The trial Court further noted that this did not include losses of time, effort and money by the investors. The lower Court also observed: "The Government's disallowance of fraudulent claims and eventual recovery of some portion of taxes owed does not diminish the extent of the fraud perpetuated by the defendant."
 
 
 113
 The actual sentencing occurred on March 22, 1991. See Supplemental Appendix F of the Appellee, Vol. IV P. 410-421. The government was arguing for a sentence of 48 years imprisonment. The defendant was urging probation. The judge weighed the arguments of both parties. He spoke of the sentencing objectives of deterrence and punishment. He spoke of the "size of this thing" (some 110 investors); of the impact on a lot of people who "gave their savings, some retirement benefits" because they thought the program was sound. He referred to them as "vulnerable people." The judge also noted the positive things about the defendant's life.
 
 
 114
 After weighing all the factors, sentences were imposed which will have the effect of five years imprisonment with five years probation to follow.
 
 
 115
 In the total chemistry of pre-guidelines sentencing it is impossible to identify the effect of any single factor or circumstance.
 
 
 116
 We find no basis in this record to challenge the sentences imposed.
 
 
 117
 AFFIRMED.
 
 
 
 *
 Honorable G. Thomas Eisele, Senior United States District Judge for the Eastern District of Arkansas, sitting by designation
 
 
 **
 This order and judgment has no precedential value and shall not be cited, or used by any court within the Tenth Circuit, except for the purposes of establishing the doctrines of law of the case, res judicata or collateral estoppel. 10th Cir.R. 36.3
 
 
 [3]
 "The element of knowledge may be established by proof that the defendant deliberately closed his eyes to what otherwise would have been obvious to him. In other words, the requirement that the defendant has acted knowingly does not mean that the defendant need to have positive knowledge of the fact in question. If the defendant failed to have knowledge of the fact in question only because he consciously avoided learning the truth, the requirement of knowledge may be satisfied
 Furthermore, the required element is established if the defendant is aware of a high probability of the existence of the fact in question, unless he actually believes it does not exist."
 
 
 [4]
 "In order to prove the defendant guilty of the offense charged in counts 1 through 16 of the indictment, the United States must prove beyond a reasonable doubt each of the following elements as to each count:
 First: that a tax return was prepared and presented to the United States by the taxpayer identified in the indictment; and
 Second: that the return was false or fraudulent as to a material matter as alleged in the indictment; and
 Third: that the defendant aided, or assisted in, or procured, or counseled, or advised, the preparation, or the presentation, of such false or fraudulent return; and
 Fourth: that the defendant did so willfully."
 
 
 [5]
 "Intent ordinarily may not be proved directly, because there is no way of fathoming or scrutinizing the operations of the human mind. But you may infer the defendant's intent from the surrounding circumstances. You may consider any statement made and done by the defendant, and all other facts and circumstances in evidence which indicate his state of mind
 You may consider it reasonable to draw the inference and find that a person intends the natural and probable consequences of acts knowingly done. As I have said, it is entirely up to you to decide what facts to find from the evidence."
 
 
 [6]
 "One may generally sell assets from one business entity he controls to another entity he controls, and be entitled to earn a profit. However, to be acceptable for tax purposes, the transaction must be one which would contain approximately the same terms and figures you would expect to find in business dealings between independent, unrelated parties, each seeking its own financial gain."
 
 
 [7]
 "The law allows a deduction for depreciation if the property is used in a bona fide trade or business, or held for production of income
 However, the law does not allow such a deduction if there is no real prospect of gain and the investment in the property was entered into, or the property was held, merely for the purpose of avoiding taxes."
 
 
 [8]
 "The defendant claims that he is not guilty of willful wrongdoing because he acted on the basis of advice from his attorneys and accountants
 If the defendant before taking any action sought the advice of attorneys and accountants whom he considered competent, in good faith and for the purpose of securing advice on the lawfulness of his possible future conduct, and made a full and accurate report to his attorneys and accountants of all material facts of which he has the means of knowledge, and acted in accordance with the advice of those professionals, then the defendant would not be willfully doing something the law forbids.
 Whether the defendant before taking any action sought the advice of attorneys and accountants who he considered competent, whether he acted in good faith for the purpose of securing legal advice relating to his possible future conduct, whether the defendant made a full and complete report to his attorneys and accountants, and whether the defendant acted in accordance with the advice of those attorneys or accountants, are questions for you to determine. However, because of the duty on the defendant to provide all material facts to those professionals on whose advice he claims to have relied, reliance on advice of counsel is not an absolute defense, but is a factor for you to consider in assessing good faith and intent."
 
 
 [9]
 "Bearing on the facts at issue, evidence has been received from Mr. Thomas claiming he had substantial assets, a growing construction business, numerous projects under way with significant financial return and with others awaiting, representing a prospect of continuing need for equipment of the type in question for the projects. In addition, it has been claimed the projects had been undertaken after advice from a CPA and attorneys he relied upon, and that if the projects had been allowed to carry to conclusion, they would have produced substantial tax deferral for the investors, with no tax loss to the government, and that said plan was not illegal
 The government has introduced evidence of claimed exaggeration of the value of the equipment and transactions between controlling corporations without economic reality on either side of the transaction. The government claims documents were signed in a manner evidencing no sincere business purpose. Further, it is asserted Mr. Thomas had a lifestyle of living in relative luxury, using homes, cars, planes and a boat of the companies involved, frequently without business purpose, while claiming only a modest income in his income tax return, while the project transactions involved substantial sums. Mr. Thomas asserted that his modest personal income was because of his desire to be frugal until the projects worked out and the investors were paid.
 No charge has been filed nor evidence introduced that establishes falsity of Mr. Thomas' tax return. The evidence of the foregoing matters may be considered, along with all the other evidence in considering the issues in this case and in determining credibility or assisting your determination of questions of intent, whether lawful or unlawful. But remember, the government must prove specific criminal intent as defined for you in these instructions, by evidence that persuades you beyond a reasonable doubt, as well as establishing all of the other elements at issue by evidence that persuades you beyond a reasonable doubt. The defendant has no obligation to present any evidence, to call any witnesses, or to meet any burden of proof."
 
 
 [10]
 "You are here to determine the guilt or innocence of the accused from the evidence in the case. You are not called upon to return a verdict as to the guilt or innocence of any other person or persons. So, if the evidence in the case convinces you beyond a reasonable doubt of the guilt of the accused, you should so find, even though you may believe one or more other persons are also guilty. But if any reasonable doubt remains in your minds after impartial consideration of all the evidence in the case, it is your duty to find the accused not guilty."
 
 
 [11]
 "In your consideration of this case you are expected to use your good sense, considering the evidence in the case for only those purposes for which it has been admitted, and giving it a reasonable fair consideration in the light of your common knowledge of the natural tendencies and inclinations of human beings
 If the accused be proved guilty beyond reasonable doubt, say so. If not so proved, say so.
 Keep constantly in mind that it would be a violation of your sworn duty to base a verdict of guilty upon anything other than the evidence in the case; and remember as well that the law never imposes on a defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence.
 Remember also that the question before you can never be: will the Government win or lose the case? The government always wins when justice is done, regardless of whether the verdict be guilty or not guilty."
 
 
 [12]
 "A reasonable doubt exists if, after careful and impartial consideration of all the evidence in the case, you do not feel convinced to a moral certainty that Mr. Thomas is guilty of the charge against him. Mr. Thomas is entitled to every inference in his favor that can reasonably be drawn from the same facts, if an inference is consistent with guilt and is also consistent with innocence, Mr. Thomas is entitled to the inference that is consistent with his innocence. If the evidence merely creates a suspicion of Mr. Thomas' guilt, or the thought that he is possibly or probably guilty, then there is a state of reasonable doubt and he is entitled to the benefit of such reasonable doubt, and you must find him not guilty. A reasonable doubt of Mr. Thomas' guilt may arise from the bad character or motives of the witnesses who testified against him, or from the evidence or failure of proof, or from the presumption of innocence that the law gives him. Each of you is entitled to decide for himself or herself whether a doubt you entertain is or is not reasonable. If it appears reasonable to you, it is your duty to acquit Mr. Thomas."
 
 
 [13]
 "The presumption of innocence is not an idle phrase and must not be taken lightly. It is an important fundamental right belonging to every person accused of a crime and you must entertain it conscientiously, sincerely, and ungrudgingly, without any mental reservation or evasion whatever, and to give the defendant the full benefit of it. The presumption of innocence continues throughout the criminal trial and the jury's deliberations, until overcome by the prosecution. It is legal proof of innocence, and is sufficient to acquit Mr. Thomas unless, after careful and impartial consideration of all the evidence, you are satisfied beyond a reasonable doubt of Mr. Thomas' guilt."
 
 
 [14]
 "To aid or assist in the preparation or presentation of a false tax return, it is necessary that the government prove that Mr. Thomas willfully associated himself in some way with such a criminal venture, and willfully participated in it as he would in something he wishes to bring about; that is to say, that he willfully seeks by some act to make the criminal venture succeed
 In order to have aided and abetted the commission of a crime Mr. Thomas must, before or at the time of the alleged crime,
 (1) have known that the crime of filing a false return was being to committed or going to be committed,
 (2) have knowingly acted in some way for the purpose of aiding or causing the filing of a false tax return, and
 (3) have willfully intended that a false tax return be filed."
 
 
 [15]
 "In determining whether Mr. Thomas aided or assisted in or procured or advised the preparation or filling the false income tax returns, it is not necessary that the defendant sign the income tax return in question. But it must be shown that he knew his fraudulent act or acts would become incorporated into a tax return
 Regarding the investors which are the subject of Counts 7 through 17, the government need not prove that the investors knew their returns were false when filed; to convict the defendant on these counts, however, the government must prove that he aided and assisted the preparation of false investors returns. It is up to you to determine whether the investors returns are false and, if so, whether the defendant willfully aided and assisted in preparation or presentation of these returns."